UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
BEACH ERECTORS, INC.,

                    Plaintiff,

             - against -

UNITED STATES DEPARTMENT OF
TRANSPORTATION, UNITED STATES
DEPARTMENT OF TRANSPORTATION
DEPARTMENTAL OFFICE OF CIVIL RIGHTS,
and JOSEPH AUSTIN Associate Director
External Civil Rights Programs Division
Departmental Office of Civil Rights,

                   Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
10 CV 5741 (DRH) (WDW)

**APPEARANCES:**

**TURNSTEAD SCHECHTER & CZIK LLP**
Attorneys for Plaintiff
500 North Broadway
Jericho, New York 11753
By:    Marvin Schechter, Esq.

**LORETTA E. LYNCH, UNITED STATES ATTORNEY**
Attorneys for Defendants
610 Federal Plaza
Central Islip, New York 11722
By:    Robert W. Schumacher, Assistant United States Attorney

**HURLEY, Senior District Judge:**

Plaintiff Beach Erectors, Inc. ("plaintiff" or "Beach Erectors") commenced this action

seeking declaratory and injunctive relief against the United States Department of Transportation

(the "DOT"), the DOT Departmental Office of Civil Rights (the "OCR"), and OCR's Associate

Director of the External Civil Rights Programs Division, Joseph Austin (collectively,

"defendants"). Pursuant to the Administrative Procedure Act, 5 U.S.C. § 702, Beach Erectors

requests judicial review of the OCR's decision to deny Beach Erectors's application for certification as a "disadvantaged business enterprise." Beach Erectors also claims that defendants violated its Equal Protection rights. Presently before the Court are plaintiff's motion and defendants' cross-motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, plaintiff's motion is denied and defendants' cross-motion is granted.

## BACKGROUND

The following facts are taken from the parties' Local Civil Rule 56.1 Statements and the Administrative Record ("AR"), and are undisputed unless otherwise noted.

### I.  The Nature of Beach Erectors's Business

Beach Erectors is a "full service miscellaneous metal subcontractor and installer," whose business operation "consists of sales and installations of miscellaneous and architectural metal products." (Pl.'s 56.1 ¶ 1.) Karlise Murphy ("Ms. Murphy") is the "100% pro forma owner of Beach Erectors," (*id.* ¶ 3), and as the owner of 100% of the issued and outstanding shares of Beach Erectors stock, she is "empowered to manage the affairs of the corporation." (*Id.* ¶ 8.) Ms. Murphy is the President of Beach Erectors and the sole member of Beach Erectors's Board of Directors. Beach Erectors is certified as a Woman-owned Business Enterprise ("WBE") by the New York City Department of Small Business Services, the New York State Empire State Development, and the Port Authority of New York & New Jersey. (AR 456-58.)

### II.  Beach Erectors's Application to the MTA for Certification as a DBE

On June 4, 2009, Beach Erectors applied to the New York Metropolitan Transit Authority

("MTA") for a certification as a Disadvantaged Business Enterprise ("DBE").[1]

## 1. The Certification Application

As part of Beach Erectors's application, Ms. Murphy completed the Certification Application, which indicated that Beach Erectors was established on June 26, 1989. (AR 135.) Ms. Murphy further indicated that, as President of Beach Erectors, she controlled the following areas of responsibility: (1) financial decisions, i.e., responsibility for acquisition of lines of credit, surety bonding, etc., (2) negotiating and contract execution, (3) hiring and firing of management personnel, (4) office management, (5) purchasing of major equipment, and (6) financial transactions. (AR 138.) Ms. Murphy stated that she and her husband, Robert J. Murphy ("Mr. Murphy"), whose title was listed as "Sales Rep," were both authorized to sign company checks, and that Mr. Murphy controlled "Marketing/Sales." (AR 138.) Ms. Murphy further indicated that the area of "Field/Production Operations Supervisor" was controlled by Robert Lester, a Field Supervisor, while the area of "Estimating and Bidding" was controlled by William Alesius and Ms. Murphy's son, Robert Murphy Jr. ("Mr. Murphy, Jr."), both of whom were Project Managers . (*Id.*)

## 2. Ms. Murphy's Résumé

Ms. Murphy's résumé was also submitted in connection with Beach Erectors's

---

[1]     As defendants explain in their brief, Congress requires a certain percentage of federal highway funding to "be expended through small business concerns that are owned and controlled by socially and economically disadvantaged individuals." (Defs.' Mem. at 1 (internal quotation marks and citations omitted).) Thus, the MTA, as a public entity that receives funding from the DOT was required to maintain a DBE program. The DOT has promulgated detailed regulations to be used in implementing such DBE programs. *See* 49 CFR Part 26. Pursuant to those regulations, the MTA, as the recipient of federal funds, was responsible for making the initial decision whether to certify Beach Erectors as a DBE. 49 C.F.R. §§ 26.69(a), 26.71(a).

application to the MTA for certification as a DBE.  On her résumé, Ms. Murphy described her duties as President of Beach Erectors as including: (1) responsibility for all banking and financial decisions, (2) knowledge of upcoming projects, and assignment of those projects to selected estimators, (3) knowledge of progress and approval of all bids, estimates, and sales, (4) contract negotiations, (5) assignment of awarded projects to selected project managers, (6) bidding and contract negotiations, (7) overseeing estimating by others, (8) labor management, hiring and firing, and labor contracts, (9) insurance policies, (10) preparing documents for periodic audits by Ironworkers Local Union 580, as well as the workmen's compensation insurance provider and the general liability insurance provider, (11) purchasing of large equipment, (12) payroll, AP/AR, taxes, (13) government reporting and filings, and (14) applications for governmental and organizational certifications.  (AR 427.)

Ms. Murphy's résumé also contained information about her prior work experience.  Ms. Murphy served as the sole proprietor of Beach Fence Company between 1976 and 1986.  (*Id.*; AR 102, 136.)[2]  In that capacity, her duties included "sales, estimates, contracts, personnel management, hiring and firing, job scheduling and supervision, payroll, AP/AR, taxes, insurance, [and] purchasing of materials and equipment."  (AR 427.)  From 1987 to 1989, Ms. Murphy served as the President of Beach Iron Erection Company, where her duties included "bidding and contract negotiations, estimating, labor management, hiring and firing, labor contracts, financial decisions, insurances, purchasing, job scheduling, payroll, AP/AR, [and] taxes."  (*Id.*)

---

[2]    Although Ms. Murphy's résumé states that she served as Sole Proprietor of Beach Fence Company from 1976 to "Present," there is information elsewhere in the Administrative Record that indicates that she stopped serving in this capacity in 1986.  (AR 102, 136.)

### 3.    **Qualifications of Mr. Murphy and Mr. Murphy, Jr.**

According to his résumé, Mr. Murphy has been a "Union ironworker" since 1973 and is "[e]xperienced in all size and type projects involving miscellaneous metals." (AR 428.) Mr. Murphy served as an Apprentice Ironworker from 1973 to 1975, and then as a Journeyman/Foreman from 1975 to 1986 with Local Union 580 Ornamental Iron Workers ("Local 580"). (*Id.*) As a foreman, Mr. Murphy's duties included "installation of miscellaneous metals items, field supervision of [the] labor force, coordination with [the] project manager, [and] record keeping." (*Id.*) From 1986 to 1989, Mr. Murphy worked as a Field Supervisor for Beach Iron Erection Company and was "[r]esponsible for the simultaneous oversight of several projects" as well as "[m]aterial deliveries to jobsite[s], labor management, [and] project coordination." (*Id.*) Beginning in 1989, Mr. Murphy worked in "Sales" for Beach Erectors. Mr. Murphy described his duties as including "knowledge of upcoming projects that may require miscellaneous metals, procuring drawings, plans and specifications for estimators . . . [making] representations to clients, [and] sales of prepared, packaged bids." (*Id.*)

Mr. Murphy, Jr. graduated from college in 1996 and worked as a Contractor Assistant for Kessler Construction, in Fort Collins, Colorado, between September 1996 and December 1997. In that capacity, his duties included "some oversight of several projects and employees, reporting job progress and problems to manager." (AR 429.) Mr. Murphy, Jr. worked as an Ironworker for Beach Erectors between January 1998 and December 1999 and worked on "[v]arious miscellaneous metal product installations involving diverse building site conditions and situations." (*Id.*) Since January 2000, Mr. Murphy, Jr. has worked as an Estimator for Beach Erectors, and his résumé describes his job duties as including "knowledge of upcoming projects

that may require miscellaneous metals, take-offs and pricing, contract negotiations and project management." (*Id.*)

### 4. The MTA Eligibility Review Meeting

During a November 18, 2009 MTA eligibility review meeting, Ms. Murphy stated that before she started the Beach Fence Company in 1976, she worked as "a caterer, as a bookkeeper for a dry cleaning company, bell boy and . . . in a gas station." (AR 101.) With respect to her work for Beach Fence Company and Beach Iron Erection Company, Ms. Murphy stated that her "work experience was in administration[,] supervision and . . . management." (AR 102.) Ms. Murphy described her current job responsibilities as President of Beach Erectors as follows: "I have control of the financial decisions, oversight of estimating, sales, contracts, project managers and the insurances. I review and sign all the certified payrolls." (AR 103.) When asked whether she was "actually involved in any of the ironwork," Ms. Murphy answered "No." (AR 103-04.) Ms. Murphy further stated:

> I think what you are getting at is that the work I'm telling you I do is administrative, but in overseeing my project managers and overseeing my laborer[s] and my contracts and all of that, I'm showing technical expertise. I have to know. For me to approve a contract, I have [to] know what is in the contract and I have to know the values of what is in the contract. I have to know how much time it would take to install the iron items in the contract. How can I oversee contracts and not have technical expertise?

(AR 105.) Ms. Murphy described the "chain of command" within Beach Erectors as follows:

> Chain of command is myself at the top, and my three project managers on the next tier, my field supervisor below that and my field ironworkers below that. . . The ironworkers report to the field supervisor, the field supervisor reports to the project managers and they report to me.

(AR 105-06.) Ms. Murphy stated that the field supervisor "[g]enerally" makes on-site decisions and "[i]f there is a problem, he will come back to the project managers and if there is a problem there, he will come back to me." (AR 106.) Ms. Murphy further stated that a project manager generally handles any customer issues that may arise. (*Id.*)

Ms. Murphy described her "typical day" as follows:

> A typical day would include checking in on my project managers, see how the projects are going. [There is] usually almost always some sort of a problem that needs to be discussed with a supplier, delivery, scheduling, checking in on anything, any estimates that are being worked on. Any work that's coming up, I get a lot of work from general contractors that solicit[ ] my numbers for projects that are up for bid, I take care of that a lot and just the typical administration of what is going on, check on my bookkeeping. I will do things like how much time I spent doing this application, reviewing contracts, going over drawings and take offs. If I have one pulling take offs for a bid, I like to be involved in that. They are very detailed. The work we do is detailed work, so the take offs can be difficult. That's kind of typical.

(AR 108-09.)

When asked who negotiated a particular contract on behalf of Beach Erectors, Ms. Murphy responded:

> My project managers, my estimator. It depends on the project, who [is] busy, who [has] got what going on. I have the three men that all three do that under my supervision. I mean, I sign off on all the contracts. They may do negotiating, they may come back to me for information. When we haggle over a price, they will come back to me, but they actually do the labor.

(AR 113-14.)

With respect to the finances of Beach Erectors, Ms. Murphy stated that corporate credit cards have been issued to her, as well as to Mr. Murphy, Mr. Murphy Jr., Alesius, and Lester.

(AR 115.)  The project managers are in charge of ordering materials, equipment, and supplies

that are needed for job sites, and Ms. Murphy's involvement in that process is "[j]ust oversight."

(AR 115-16.)  Ms. Murphy stated that both she and her husband sign checks drawn on the

company's business account, although Ms. Murphy is the only individual with authority to sign

alone.  (AR 116-17.)

### 5.    The Site Visit

On December 11, 2009, the MTA conducted a site visit at Beach Erectors's commercial

building in Island Park, New York.  (AR 75.)  During a tour of the workspace, Ms. Murphy

"explained the use of numerous [pieces of] equipment used in the process of prefabrication of

miscellaneous metals," but stated that "she has not operated the equipment in the shop."  (AR

76.)  Rather, Ms. Murphy "acquired the knowledge of the machines/equipment operating

procedures from owning and working for the business for many years."  (*Id.*)

### 6.    Ms. Murphy's January 4, 2010 Letter

In a follow-up letter written by Ms. Murphy to the MTA on January 4, 2010, Ms. Murphy

described her "technical knowledge and expertise" as having been "developed painstakingly and

slowly taking baby steps over a period of more than 25 years."  (AR 35.)  Ms. Murphy further

stated that since 1985, her "labor pool" of "professional ornamental ironworkers" had been

"drawn from" Local 580.  (*Id.*)  According to Ms. Murphy, her contract with Local 580 "does not

allow [her] as an owner to physically install the work [herself] but rather [requires her to]

delegate the installation to a [L]ocal 580 foreman of [her] choosing . . . ."  (AR 36.)

### 7.    Ms. Murphy's References

As part of its eligibility review, MTA contacted two references listed on Beach Erectors's

Certification Application: Jason Loeb and Bob Taikina. Both stated that Beach Erectors had provided miscellaneous metal work services for their respective businesses, and both identified Ms. Murphy as the owner of Beach Erectors. (AR 74.) Both references also identified Alesius as the "person of contact" for Beach Erectors. (*Id.*) Taikina stated that he negotiated his contract with Ms. Murphy, while Loeb could not identify the individual with whom he engaged in contract negotiations.

### III.    *The MTA's Decision to Deny Beach Erectors's Application for Certification as a DBE*

In a written decision dated March 31, 2010, the MTA denied Beach Erectors's application for DBE certification. (AR 31-34.) The MTA's decision was based upon four separate conclusions. First, the MTA determined that Ms. Murphy "d[id] not have the technical competence and experience directly related to the type of business in which the firm is engaged," i.e., "the installation of miscellaneous metal products," as is required by 49 C.F.R. § 26.71(g). (AR 31.) The MTA concluded that Ms. Murphy did not have "any training, experience or expertise in the installation of miscellaneous metal products," nor did she have any prior employment experience "wherein she performed the services Beach Erector, Inc. provides." (AR 32.) According to the MTA, Ms. Murphy's contribution to Beach Erectors "appears to be managerial and administrative in nature, and not sufficient to demonstrate control in accordance with federal regulation[s]." (*Id.*)

Second, the MTA concluded that Ms. Murphy did not "control the technical operations of Beach Erectors, Inc." as required by 49 C.F.R. § 26.71(f). (*Id.*) Specifically, the MTA determined that Ms. Murphy lacked the "necessary technical expertise, competence and experience in iron work or in the installation of miscellaneous metal products" to allow her to

"exercise control over the technical operations of the firm." (*Id.*) Further, the MTA found that she was "dependent upon the expertise and experience of non-socially and economically disadvantaged employees," i.e., Mr. Murphy, Mr. Murphy, Jr., Alesius, and Lester. (*Id.*)

Third, the MTA determined that "[i]ndividuals who are not socially and economically disadvantaged are disproportionately responsible for the operation of Beach Erectors, Inc.," which is prohibited by 49 C.F.R. § 26.71(e). (*Id.*) In particular, "Messers. Murphy, Murphy, Jr., Alesius and Lester," all of whom are "experienced in the iron work trade" and "have direct experience in performing the services that Beach Erectors, Inc. provides," "exercise the power to control the technical operations of Beach Erectors, Inc. and[,] consequently, are disproportionately responsible for the operations of the firm." (AR 33.)

Fourth, the MTA decided that, pursuant to 49 C.F.R. § 26.71(k)(2), Beach Erectors had failed to carry its burden of proving its entitlement to a DBE certification because "[i]t cannot be determined that [Ms.] Murphy, the socially and economically disadvantaged owner, as distinct from the family as a whole, controls the firm." (*Id.*) The MTA concluded that Ms. Murphy was "dependent" upon her husband and son "for the technical knowledge, expertise and experience to make Beach Erectors, Inc. operational," and that Ms. Murphy had "not demonstrated that she can independently control the technical operations" of Beach Erectors without her husband and son. (*Id.*)

## IV.   *Beach Erectors's Appeal to the OCR*

On June 3, 2010, Beach Erectors appealed the MTA's decision to the OCR. (AR 27-30.) Beach Erectors maintained that the applicable regulations do not require Ms. Murphy to "physically perform field labor in order to obtain DBE Certification." (AR 29.) According to

Beach Erectors, Ms. Murphy is "involved in manpower issues, bids, obtaining new business, reviewing scopes of work and specifications," but leaves the physical work to Local 580 members, "not unlike any other business enterprise that relies upon employees." (*Id.*)

Beach Erectors further asserted that "Ms. Murphy controls her business" in that she "has the power to accept and reject work [and] has the power to hire and fire." (*Id.*)  Beach Erectors concluded: "It appears that the MTA's decision objects to the fact that Ms. Murphy also has employees, all of whom are Local 580 personnel." (*Id.*)

## V.      *The OCR Affirms the MTA's Denial of DBE Certification*

In a letter dated November 5, 2010, Austin communicated the OCR's decision that the MTA's denial of Beach Erectors's application for DBE certification was "supported by substantial record evidence" demonstrating that Ms. Murphy, "the socially and economically disadvantaged owner of [Beach Erectors,] does not control the firm as required by [49 C.F.R.] § 26.71." (AR 1.)  According to the OCR, the administrative record demonstrated that "Ms. Murphy's role at [Beach Erectors] is non-technical and there is no support in the record that she possesses any experience with the installation of ironwork and metal products." (AR 10.)  The OCR noted that Ms. Murphy "does not appear to participate in core installation responsibilities," and the record did not contain "documentation substantiating her relative experience in the firm's field operations." (*Id.*)  While acknowledging that the regulations "do[ ] not require Ms. Murphy to physically perform labor in the field," the OCR concluded that "[t]he record does not substantiate that Ms. Murphy would be able to critically assess the activities of the ironworkers given her lack of actual field experience." (AR 11.)

The OCR further found that the record evidence of the "combined professional

qualifications" of Mr. Murphy, Mr. Murphy, Jr., Alesius, and Lester, when considered in conjunction with their "role in the firm's technical workload," led to the conclusion that "they are disproportionately responsible for operations of [Beach Erectors]" and that "their qualifications, knowledge, and abilities are indispensable for the firm to operate on a day-to-day basis."  (AR 12.)

Finally, the OCR concluded that Beach Erectors "is clearly a family-run firm, with Ms. Murphy handling the office functions of the firm and her husband and son (both non-disadvantaged) jointly controlling the firm's work in the field."  (AR 13.)  As such, the OCR determined that Beach Erectors had not met its "burden of proof concerning [Ms. Murphy's] control of [Beach Erectors]" pursuant to 49 C.F.R. § 26.71(k).  (*Id.*)

## DISCUSSION

### I.      Legal Standards

#### A.      Summary Judgment

"Summary judgment is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency."  *Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 405 (S.D.N.Y. 2005) (quoting Charles A. Wright, *Federal Practice & Procedure* § 2733 (3d ed. 1998)), *aff'd*, 538 F.3d 124 (2d Cir. 2008).  Pursuant to Rule 56, summary judgment may be granted only where admissible evidence demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the

non-movant, that no rational jury could find in the non-movant's favor.  *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986).  The Court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party.  *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).   A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion.  *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim.  *See id.* at 210-11.  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'"  *Id.* at 211 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.    Administrative Procedure Act

Under the APA, a court reviewing a final agency action is required to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and

applicability of the terms of an agency action." 5 U.S.C. § 706. The Court's review is "limited," and an agency's action may be set aside only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in excess of the agency's statutory jurisdiction or authority, or without observance of procedure required by law." *Natural Res. Def. Council, Inc. v. United States Dep't of Agric.*, 613 F.3d 76, 83 (2d Cir. 2010) (quoting 5 U.S.C. § 706(2)(A), (C) & (D)).

When "evaluating agency reasoning," the Court "must be satisfied that the agency examined the relevant data and established a 'rational connection between the facts found and the choice made.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "The agency's action should only be set aside where it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the products of expertise.'" *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 89-90 (2d Cir. 2000) (quoting *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43). "If a court determines that an agency action violated the APA standard, the proper course is for the action, findings, and conclusions to be vacated, then remanded to the agency for further administrative proceedings consistent with the court's opinion." *Brooklyn Heights Ass'n v. Nat'l Park Serv.*, 818 F. Supp. 2d 564, 568 (E.D.N.Y. 2011) (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) and 5 U.S.C. § 706).

## C.     *Applicable Regulations*

As explained above, recipients of certain federal funds – such as the MTA – must apply the regulations set forth in 49 C.F.R. Part 26 to determine whether an applicant firm is eligible for DBE certification.  49 C.F.R. § 26.71(a).  To be eligible for DBE status, "a firm must be at least 51 percent owned by socially and economically disadvantaged individuals."  49 C.F.R. § 26.69(b).  There is a rebuttable presumption that, *inter alia*, women "are socially and economically disadvantaged individuals."  49 C.F.R. §§ 26.61(c) & 26.67(a)(1).  In addition to determining social and economic disadvantaged status, the recipient of federal funds must determine whether the applicant firm is "control[led]" by the socially and economically disadvantaged owner.  49 C.F.R. §§ 26.61(e).  This determination is to be made by "consider[ing] all the facts in the record, viewed as a whole."  49 C.F.R. § 26.71(a).

If the recipient of federal funds denies a firm's application for DBE certification, the applicant firm may appeal the denial to the OCR.  49 C.F.R. § 26.89(a).  The OCR "makes its decision based solely on the entire administrative record" and "does not make a de novo review of the matter and does not conduct a hearing."  49 C.F.R. § 26.89(e).  The OCR will reverse an initial denial of DBE certification only if it concludes that the denial "was unsupported by substantial evidence or inconsistent with the substantive or procedural provisions of this part concerning certification."  49 C.F.R. § 26.89(f)(2).  Reversal is not required if it would be based solely upon a "procedural error [that] did not result in fundamental unfairness to the [applicant] or substantially prejudice the opportunity of the [applicant] to present its case."  49 C.F.R. § 26.89(f)(3).  The regulations further provide that the OCR will not uphold an initial decision "based on grounds not specified in [that] decision," and the OCR's decision is "based on the

status and circumstances of the firm as of the date of the decision being appealed." 49 C.F.R. § 26.89(f)(5), (6).

## II.     *Plaintiff's APA Claim*

In its decision, the OCR did not discuss (or take any issue with) the MTA's determinations that Ms. Murphy was socially and economically disadvantaged and that she was the sole owner of Beach Erectors. (AR 0001.) Rather, the OCR focused its analysis on the question of whether Ms. Murphy had "control" of Beach Erectors, and ultimately concluded that "substantial record evidence supports a conclusion that Ms. Karlise M. Murphy . . . does not control the firm as required by [49 C.F.R.] § 26.71." (*Id.*)

The regulations provide some guidance as to whether a particular socially and economically disadvantaged owner "control[s]" her firm. *See generally* 49 C.F.R. § 26.71. An owner "may delegate various areas of the management, policymaking, or daily operations of the firm to other participants in the firm," so long as such delegations are "revocable" and the owner "retain[s] the power to hire and fire any person to whom such authority is delegated." 49 C.F.R. § 26.71(f). To have the requisite "control" over her firm, the owner "must have an overall understanding of, and managerial and technical competence and experience directly related to, the type of business in which the firm is engaged and the firm's operations." 49 C.F.R. § 26.71(g). While the owner is "not required to have experience or expertise in every critical area of the firm's operations, or to have greater experience or expertise in a given field than managers or key employees," she "must have the ability to intelligently and critically evaluate information presented by other participants in the firm's activities and to use this information to make independent decisions concerning the firm's daily operations, management and policymaking."

16

*Id.*

The OCR concluded that Ms. Murphy's role at Beach Erectors was "non-technical," in that she "does not appear to participate in core installation responsibilities" of the company, and there was no record evidence "substantiating her relative experience in the firm's field operations" or demonstrating "that she is able to perform any of the[ ] types of work . . . that the firm's non-disadvantaged participants perform."  (AR 10.)  Moreover, the OCR determined that "Ms. Murphy's experience would not transfer to actual completion of projects."  (AR 11.) Contrary to plaintiff's assertions, and as discussed below, these conclusions do have some "rational connection" to the facts in the record.  *See Fund for Animals*, 538 F.3d at 132.

The record evidence before the OCR reflected that Ms. Murphy never had any formal technical training or actual field work experience.  During the on-site visit, Ms. Murphy stated that she had not operated the equipment in the shop.  (AR 76.)  The only evidence regarding the extent of Ms. Murphy's technical experience was in the form of her somewhat vague assertions that she had acquired such experience by virtue of her years as the owner of Beach Erectors and its predecessor companies.  (*See* AR 35 ("My technical knowledge and expertise was developed painstakingly and slowly taking baby steps over a period of more than 25 years."); AR 76 (noting Ms. Murphy's statement during the on-site visit that "she has acquired the knowledge of the machines/equipment operating procedure from owning and working for the business for many years").)  Despite these assertions, the OCR concluded that Ms. Murphy's role as owner of Beach Erectors was "limited" to "office management and administration related functions," and that in her role as owner of the predecessor firms she "engaged in office activities similar to what she is doing now."  (AR 11.)  Ms. Murphy suggested that her work "oversee[ing]" contract negotiations

17

and execution necessarily required her to have technical expertise. (AR 105 ("For me to approve a contract, I have [to] know what is in the contract and I have to know the values of what is in the contract.").) The record is clear, however, that Ms. Murphy's work approving contracts is done in conjunction with her project managers, who are all non-disadvantaged males and who all have significant technical and field work experience. (AR 113-14.)

In its decision, the OCR stated that while the applicable regulations "do[ ] not require Ms. Murphy to physically perform the labor in the field," she is required to "intelligently and critically evaluate information" presented to her in order to "make independent decisions concerning the firm's daily operations, management, and policymaking." (AR 11.) The OCR concluded that Ms. Murphy's "lack of actual field experience" hindered her ability to "critically assess the activities of the ironworkers" in the field. (*Id.*) By way of example, the OCR cited Ms. Murphy's description of her "chain of command for the resolution of problems in the field," which started with field supervisors and then went to project managers before coming to her, and concluded that her attenuated involvement with field-level problems was "indicative that her experience is not relied upon when problems arise unless they are . . . non-technical or office related." (*Id.*)

Plaintiff argues that the OCR's decision that Ms. Murphy did not have control of her firm was based entirely on its perception that she lacked technical expertise, and that this was improper. (*See* Pl.'s Mem. at 9; Pl.'s Reply at 11-12.) Plaintiff supports this argument by citing to *Jack Wood Construction Co., Inc. v. United States Department of Transportation*, 12 F. Supp. 2d 25 (D.D.C. 1998). This citation is unavailing, however, to the extent that this decision was based on regulatory language that has since been amended. The regulations cited by the court in

*Jack Wood Construction Co., Inc.* stated that a disadvantaged owner "must have *either* managerial *or* technical competence and experience in order to be considered to possess sufficient control; he or she is not required to have *both* managerial *and* technical competence and experience." *Id.* at 29 (citing 49 C.F.R. § 23.53(a)(3)) (emphases in the original). The current regulations, by contrast, require disadvantaged owners to have "managerial *and* technical competence and experience directly related to . . . the firm's operations." 49 C.F.R. § 26.71(g) (emphasis added); *see also* 64 Fed. Reg. 5096, 5120 (Feb. 2, 1999) ("The [*Jack Wood Construction Co., Inc.*] court also said that the existing rule language did not make it necessary for a disadvantaged owner to have both technical and managerial competence to control a firm. Part 26 solves [this] problem[ ] that the court found to exist in part 23's control provisions.").

Where, as here, a plaintiff generally does not dispute OCR's recitation of the facts in its decision, but disagrees with the impact those facts have on the question of "control," the "agency has considerable discretion to determine what constitutes the appropriate level of operation and control." *Car-Mar Constr. Corp. v. Skinner*, 777 F. Supp. 50, 54 (D.D.C. 1991). Given the evidence in the record regarding Ms. Murphy's lack of technical and field work experience, as well as the evidence that non-disadvantaged male employees with far greater technical and field work experience controlled tasks such as field supervision and estimating, the OCR's determination that Ms. Murphy lacked the requisite control over Beach Erectors was not arbitrary and capricious. *See id.* (finding DOT did not act arbitrarily and capriciously in determining owner lacked control when she lacked any technical expertise and "the individual . . . who possesses the essential background in expertise to control critical operational decisions (estimating, bidding, field supervision, etc.) is not Mrs. Pendleton; but her husband . . . ."); *Lane*

*& Clark Mech. Contractors, Inc. v. Burnley*, 1990 WL 50509, at **6-7 (E.D.Pa. Apr. 19, 1990)

(finding that the DOT's decision that the owner lacked control was not arbitrary and capricious

when a non-disadvantaged employee with extensive technical training and experience served "as

a technical expert for contract bid preparation and field/technical supervision" and the owner had

no field work experience or technical training, other than "just what I've been learning over the

years"); *Whitworth-Borta, Inc. v. Burnley*, 1988 WL 242625, at *3 (W.D.Mich. June 28, 1988)

("The Department did not hold that Mr. Whitworth's lack of engineering expertise necessarily

precludes a determination that he controls the company, but found that it handicaps him in his

ability to control, and in his actual participation in, the principal activities of the company.").

Plaintiff argues that the OCR placed undue emphasis on the fact that Beach Erectors's

"employees perform the physical work that Ms. Murphy does not perform." (Pl.'s Mem. at 11.)

Plaintiff asserts that Ms. Murphy merely delegated the duties of performing physical labor to

Local 580 members – a delegation that is permissible under the applicable regulations – and

emphasizes that Ms. Murphy retained the power to terminate those employees at all times. (*Id.* at

12.) On this point, the Court finds the following reasoning of the district court in *Car-Mar*

*Construction Corp.* to be persuasive:

> It is not inconsistent that the owner should be allowed to contract
> with managerial employees and yet still require a base level of
> technical knowledge of the industry. The ability to hire and fire rests
> on the owner's ability to gauge the effectiveness of those to whom
> operations are contracted. For the agency to require some technical
> knowledge is not plainly erroneous nor inconsistent with the
> regulations.

*Car-Mar Constr. Corp.*, 777 F. Supp. at 55. Here, the OCR determined that Ms. Murphy's lack

of technical expertise hampered her ability "to critically assess the activities of the ironworkers,"

(AR 11), and the Court does not find this determination to be arbitrary and capricious.

Plaintiff also asserts that the OCR erred by comparing Ms. Murphy's level of technical expertise and experience with the technical experience of her non-disadvantaged male employees, including her husband and son, because "[t]his is not a situation where Ms. Murphy must have demonstrated a higher, specialized level of expertise than her employees to satisfy the requirement for control."  (Pl.'s Mem. at 10.)  Indeed, the regulations provide that a disadvantaged owner is "not required . . . to have greater experience or expertise in a given field than managers or key employees."  49 C.F.R. § 26.71(g).  It is not arbitrary and capricious, however, for the OCR to compare Ms. Murphy's technical expertise to that of her non-disadvantaged male employees as part of its determination whether Ms. Murphy possessed "the ability to intelligently and critically evaluate information . . . and to use this information to make independent decisions concerning the firm's daily operations, management, and policymaking." *Id.*; *see Whitworth-Borta, Inc.*, 1988 WL 242625 at *3 (finding the DOT's discretion was "certainly broad enough to permit consideration of Mr. Whitworth's lack of engineering expertise as *one* factor in determining the extent of his actual control of an engineering consulting firm which is, in important respects, co-managed by two licensed engineers").

Overall, having reviewed the evidence before the OCR, and remaining mindful that the Court is not free to substitute its opinion for that of the reviewing agency, *see Air Design Sys., Inc. v. Card*, 1992 WL 373142, at *5 (N.D.Ill. Dec. 10, 1992), the Court finds that the OCR's determination that Ms. Murphy lacked the required "managerial and technical competence and experience" necessary to maintain "control" over Beach Erectors, 49 C.F.R. § 26.71(g), was not arbitrary or capricious.  Accordingly, the Court need not examine the OCR's determinations that

non-disadvantaged individuals, i.e., Messers. Murphy, Murphy, Jr., Alesius, and Lester, were

"disproportionately responsible for [the] operations" of Beach Erectors, 49 C.F.R. § 26.71(e), (f),

or that Beach Erectors was "clearly a family-run firm," 49 C.F.R. § 26.71(k).  (AR 12-13.)  *See*

*Shearin Construc., Inc. v. Mineta*, 232 F. Supp. 2d 608, 615 (E.D.Va. 2002) (finding DOT's

decision to deny DBE certification "must be upheld if the decision can be sustained on any of the

three determinative issues").  Plaintiff's remaining arguments are without merit.[3]

### III.    *Plaintiff's Equal Protection Claim*

In its Complaint, plaintiff asserts that defendants violated its "Equal Protection Rights

granted by the Fourteenth Amendment to the United States Constitution" because "applications

for DBE certification with qualifications similar to Plaintiff's Application have been approved by

Defendants."  (Compl. ¶¶ 32, 35.)  Plaintiff alleges that it has suffered "intentional selective

treatment" based on unspecified "impermissible considerations."  (*Id.* ¶ 33; *see also* Pl.'s Reply

at 13 (asserting that "[t]he Defendants intentionally subjected the Plaintiff to unusual and

irrational treatment, treating [plaintiff] differently than others similarly situated").)  As currently

pled, the contours of plaintiff's equal protection claim are murky at best.  In plaintiff's legal

memorandum, however, it clarifies that it is attempting to assert a "class of one" claim.  (Pl.'s

Reply at 13.)  As an initial matter, plaintiff's equal protection claim against defendants must be

---

[3]        Contrary to plaintiff's contention that the OCR did not sufficiently articulate the
basis for its determination, (Pl.'s Mem. at 6), the Court concludes that the OCR's written
decision adequately reflects its "examin[ation of] the relevant data and articulate[s] a satisfactory
explanation for its action."  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The Court is
similarly unpersuaded by plaintiff's assertion that the OCR "improperly . . . added new grounds
and arguments in support of the Certification Denial" when it made the following passing
statement at the conclusion of its decision: "While § 26.71(d) was not cited by NYMTA in its
Certification Denial Decision, Ms. Murphy fails to meet the control requirements of this section .
. . ." (AR 12.)

brought under the Fifth, rather than the Fourteenth, Amendment.  *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.21 (1987) ("The Fourteenth Amendment applies to actions by a State . . . The Fifth Amendment, however, does apply to the Federal Government and contains an equal protection component.").  The Supreme Court's "approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Weingerger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

Plaintiff's claim is fatally defective, however, because it has utterly failed to identify any similarly-situated comparators who were treated differently than it.  *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) ("The Supreme Court has 'recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'") (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Thus, to the extent plaintiff is attempting to assert an equal protection claim on the grounds that defendants treated its application for DBE certification differently than applications for DBE certification submitted by other, unidentified firms, such a claim is not supported by evidence that could establish discriminatory intent, and is therefore dismissed.

*CONCLUSION*

For the reasons set forth above, plaintiff's motion for summary judgment is denied, and defendants' cross-motion for summary judgment is granted.  The Clerk of the Court is respectfully directed to close this case.


**SO ORDERED.**

Dated: Central Islip, New York
        September 7, 2012                              ___/s/_____
                                                      Denis R. Hurley
                                                      Unites States District Judge